UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| JACK CHRISTOPHER CARSWELL,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>KYLE FERRARI,<br><br>　　　　Defendant. | Case No. 1:23-cv-00468-BLW-REP<br><br>**REPORT AND RECOMMENDATION** |

　　　　Pending before the Court is Defendant Kyle Ferrari's Motion for Summary Judgment (Dkt. 40) and Motion to Take Judicial Notice (Dkt. 41). For the reasons set forth below, the undersigned recommends that the Court grant both motions.

## PROCEDURAL HISTORY

　　　　Plaintiff filed this civil rights lawsuit on October 19, 2023. (Dkt. 1.) Only one claim survived the initial screening process: a First Amendment retaliation claim alleging that a Nampa police officer – Defendant Kyle Ferrari – improperly charged Plaintiff with misdemeanor crimes of disturbing the peace for yelling "fuck the police" at a neighbor on three different occasions. (Dkt. 12.)

　　　　On April 28, 2025, Defendant Ferrari filed a motion for summary judgment, which asserted qualified immunity and asked the Court to dismiss Plaintiff's First Amendment claim with prejudice. (Dkt. 40.) To support this motion, Defendant submitted three affidavits. *Id.* Defendant also filed a motion for judicial notice, asking the Court to consider several state court

REPORT AND RECOMMENDATION - 1

records that were filed in connection with three, different criminal cases brought against Plaintiff. (Dkt. 41.) Plaintiff has not filed a response to these motions.

On June 9, 2025, the undersigned's staff attorney emailed Mr. Carswell to inquire about the missing summary judgment response. Mr. Carswell responded with an email indicating that he was no longer willing to participate in the case, because he believes that that the judges assigned to the matter have "refused to honor their Oaths of office to the Constitution" and have issued unfair, unjust, and incompetent rulings against him.[1]

When a litigant elects not to file a response to an evidentiary motion, like a motion to take judicial notice, "such failure may be deemed to constitute a consent to . . . the granting of said motion." District of Idaho Local Civil Rule 7.1(e)(1). Here, Plaintiff has made a deliberate decision not to contest any of the facts that Defendant has presented in support of his motion for summary judgment. The undersigned, consequently, recommends that the Court grant the motion for judicial notice.

The Court may not take the same streamlined approach to Defendant's motion for summary judgment. Even when a litigant fails to file a response to a summary judgment motion, the Court must "independently evaluate the sufficiency of the motion." *Cristobal v. Siegel*, 26 F.3d 1488, 1491 (9th Cir. 1994) (where a nonmoving party fails to respond to a motion for summary judgment, this alone does not provide authority to grant the motion); *see also* District of Idaho Local Rule 7.1(e)(2) ("In motions brought under Federal Rule of Civil Procedure 56, if the non-moving party fails to timely file any response documents required to be filed, such failure will not be deemed a consent to the granting of said motion by the Court."). As required

---

[1] Mr. Carswell failed to appear at the next status conference, on June 12, 2025. (Dkt. 43.)

**REPORT AND RECOMMENDATION - 2**

by these authorities, the undersigned will independently assess Plaintiff's First Amendment retaliation claim.

## FACTUAL BACKGROUND

The following facts are undisputed. On the evening of October 10, 2023, Kyle Ferrari, a Nampa Police Department (NPD) officer, responded to a call regarding an alleged disturbance in Plaintiff Jack Christopher Carswell's neighborhood. PC Aff. at 1 (Dkt. 41, pp. 3-4). The individual who reported the disturbance was a man named Thomas Chevallier. *Id.*; *see also* Ferrari Aff. ¶ 2 (Dkt. 40-3). Mr. Chevallier told Officer Ferrari the following:

In the beginning of September, Mr. Chevallier was outside in his front yard when a man driving a black truck stopped, rolled down his window, and yelled "Hey . . . fuck the police" at him. PC Aff. at 1 (Dkt. 41, pp. 3-4). At the time, Mr. Chevallier believed the driver was not from his neighborhood. *Id.* A few days later, however, Mr. Chevallier saw the black truck parked at a house a few streets away. Mr. Chevallier learned from another neighbor that the truck belonged to Mr. Carswell. *Id.*

On October 10, 2023, Mr. Carswell drove by Mr. Chevallier's house and yelled "fuck the police" again. This time, Mr. Chevallier's wife was inside the garage getting ready for a vacation. *Id.* According to Mr. Chevallier, Mr. Carswell's yelling startled and scared his wife and was so loud he could hear it from inside the home. *Id.* Mr. Chevallier immediately went to Mr. Carswell's house and spoke with Mr. Carswell through a "camera doorbell." *Id.* According to Mr. Chevallier, Mr. Carswell began cussing at him and told him to get off his property or else he would shoot him. *Id.*

After hearing this story, Officer Ferrari attempted to contact Mr. Carswell to issue him a misdemeanor summons for disturbing the peace, but Mr. Carswell did not answer his door. *Id.*

REPORT AND RECOMMENDATION - 3

Six days later, on October 16, 2023, Mr. Chevallier called Officer Ferrari and informed him that Mr. Carswell had just driven by Mr. Chevallier's house, pointed his middle finger at Mr. Chevallier, and yelled, "fuck the police." *Id.* Mr. Chevallier told Officer Ferrari he wanted to "press charges" because he believes that Mr. Carswell's behavior was "directed at him because he was a [retired] police officer and ha[d] a thin blue line flag in the front yard." *Id.*

Later that evening, Officer Ferrari and another NPD officer went to Mr. Carswell's home. Once again, Mr. Carswell failed to answer the door. Ferrari Aff. ¶ 3 (Dkt. 40-3). Officer Ferrari spoke to the ring camera and told Mr. Carswell he would be seeking a warrant for his arrest for disturbing the peace. *Id.* Officer Ferrari also told Mr. Carswell to stop harassing his neighbors.[2] *Id.*

Two days later, on October 18, 2023, Officer Ferrari signed a probable cause affidavit, charging Mr. Carswell with disturbing the peace under Idaho Code § 18-6409 and recommending that a warrant be issued for his arrest. PC Aff. (Dkt. 41, pp. 3-4). To explain why charges were warranted, Officer Ferrari wrote, "It is making [Mr. Chevallier] and his wife very uncomfortable with the statements alone, the foul language, and the constant harassment, and I believe the crime elements for Disturbing the Peace have been met." *Id.*

On November 20, 2023, a judge in Washington County, Idaho issued a warrant for Mr. Carswell's arrest for failing to appear on an unrelated careless driving charge. *See* Bench Warrant (Dkt. 41, pp. 5-6). On January 17, 2024, NPD Officer J. Krohn went looking for Mr. Carswell to arrest him on this warrant. Krohn PC Aff. At 1 (Dkt. 41, pp. 7-8). During the arrest,

---

[2] In this Third Amended Complaint, Mr. Carswell describes the message that Officer Ferrari left as follows: "I was immediately threatened with an arrest. I was told that my 'behavior' is not going to be tolerated in the City and that 'they' would be 'keeping an eye on me' in order to make sure I am following 'the rules.'" Third Amended Compl. at 6 (Dkt. 11-1).

**REPORT AND RECOMMENDATION - 4**

NPD officers deployed pepperball munitions into the back window of Mr. Carswell's vehicle. *Id.* Mr. Carswell was ultimately detained, booked in jail, and then later released pending trial. *Id.*

The day after the arrest, on January 18, 2024, the Canyon County prosecutor's office filed a criminal complaint charging Mr. Carswell with three counts of disturbing the peace for yelling "fuck the police" at the Chevallier home on September 5, October 10, and October 16, 2023. *See* Crim. Compl. (Dkt. 41, pp. 9-11). The Canyon County Clerk of Court issued a criminal summons ordering Plaintiff to appear on these charges. *See* Summons (Dkt. 11-1, pp. 16-18). But the summons was returned "non-found" by a Nampa police officer (who was not Officer Ferrari) the same day it was issued. *Id.*

Several months later, on March 7, 2024, Judge Debra Orr issued a warrant directing that Plaintiff be arrested on the disturbing the peace charges. *See* Arrest Warrant (Dkt. 41, pp. 12-16). NPD Officer Bobby Maddox executed the warrant on March 22, 2024. *Id.*

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255; *Devereaux v. Abbey*, 263

REPORT AND RECOMMENDATION - 5

F.3d 1070, 1074 (9th Cir. 2001) ("Viewing evidence in the light most favorable to the nonmoving party, we must determine whether there any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000)). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

## QUALIFIED IMMUNITY

Qualified immunity shields law enforcement officials from liability for harm caused by reasonable mistakes, protecting all but the "plainly incompetent or those who knowingly violate the law." *Easley v. City of Riverside*, 890 F.3d 851, 856 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). The qualified immunity inquiry involves two steps. When a defendant asserts qualified immunity, the Court must evaluate: (1) whether the defendant violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the defendant's conduct, i.e., whether the contours of the right were sufficiently well developed that a reasonable official should have known his conduct was unlawful. *Id.* Unless the answer to both questions is "yes," the defendant is entitled to immunity. *Id.*

In conducting this inquiry, the Court adopts the plaintiff's version of the facts. *Tolan*, 572 U.S. at 655-656; *Easley*, 890 F.3d at 856 (evaluating a qualified immunity summary judgment motion by drawing factual inferences in the light most favorable to the plaintiff, the nonmoving party).

The Court maintains the discretion to address either prong of the qualified immunity analysis first. *Easley*, 890 F.3d at 856.

REPORT AND RECOMMENDATION - 6

## DISCUSSION

The First Amendment prohibits the government from punishing individuals for criticizing the police. *Houston v. Hill*, 482 U.S. 451, 461 (1987); *see also Duran v. Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("The freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by which we distinguish ourselves from a police state."). If an "official takes adverse action against someone" based on such criticism, therefore, "and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). There are three basic elements to such a claim. *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). First, the plaintiff must show that he engaged in constitutionally protected activity. *Id.* Second, the defendant must have subjected the plaintiff to an adverse action that would "chill a person of ordinary firmness" from continuing to engage in the protected activity. *Id.* Third, the protected activity must have been a substantial motivating factor in the defendant's conduct. *Id.*

During the initial screening process, the district judge who was originally assigned to the case – Judge Amanda K. Brailsford – reviewed Officer Ferrari's probable cause affidavit and determined that the information set forth therein satisfied each of these elements. Fourth Screening Order at 5-7 (Dkt. 12.) The only challenge Defendant raises to this reasoning is that Plaintiff's speech should be classified as unprotected fighting words. For the reasons set forth in detail below, this argument is uncompelling. The undisputed evidence supports Plaintiff's claim that Officer Ferrari charged him with a crime for shouting a political message – "fuck the police" – at a neighbor who found this message unwelcome.

REPORT AND RECOMMENDATION - 7

In the context of a First Amendment retaliatory arrest claim, however, a prima facie showing of retaliation is not enough to survive summary judgment. When a plaintiff challenges his arrest on First Amendment grounds, as Plaintiff does here, the Supreme Court has imposed an additional barrier to liability. For a retaliatory arrest claim to proceed to trial, a plaintiff must either (i) "plead and prove the absence of probable cause" or (ii) present "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech ha[ve] not been." *Ballentine v. Tucker*, 28 F.4th 54, 62 (9th Cir. 2022) (quoting *Nieves*, 587 U.S. at 400). Because Plaintiff has not satisfied either of these requirements, the undersigned recommends that the Court grant summary judgment in Officer Ferrari's favor and dismiss the case with prejudice.

### A. Fighting Words

Defendant's primary contention on summary judgment is that Plaintiff's statements constitute "fighting words." In other words, Defendant maintains that Plaintiff's criticism of the police was not constitutionally protected. The undersigned disagrees. Fighting words are one of a few limited categories of speech that the Supreme Court has permitted states to outlaw. *See United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012) (listing the "traditional categories" of speech that are not considered part of "the freedom of speech"). In her Fourth Screening Order, Judge Brailsford addressed the applicability of the "fighting word" exception to this case and held that it did not apply. Fourth Screening Order at 5-6 (Dkt. 12.) While this decision was summary in nature and was made without the benefit of briefing, it is indictive of the weakness of Defendant's position.

Fighting words are "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent

REPORT AND RECOMMENDATION - 8

reaction." *Virginia v. Black*, 538 U.S. 343, 359 (2003). As this definition makes clear, mere advocacy cannot be considered fighting words, no matter how profane or vulgar the language may be. Fighting words require a direct and personal insult. *See Cohen v. California*, 403 U.S. 15, 20 (1971). In addition, to qualify as fighting words, an insult must give rise to a likelihood that the hearer will make "an immediate violent response." *United States v. Poocha*, 259 F.3d 1077, 1080-81 (9th Cir. 2001); *see also Tex. v. Johnson*, 491 U.S. 397, 409 (fighting words are words that invite the listener to "to exchange fisticuffs").[3]

Saying "fuck the police" in response to someone displaying a thin blue line flag – i.e. to someone showing support for the police – does not satisfy either of these requirements. *See Cohen*, 403 U.S. at 20 (wearing a jacket that said "Fuck the Draft" to a courthouse could not be considered fighting words) and *State v. Suiter*, 138 Idaho 13, 16 (Idaho 2002) (telling a detective to "fuck off" may be "vulgar and impolite," but cannot be characterized as fighting words, under *Cohen* and *Chaplinsky*, because it is a relative common phrase that does not demean or abuse the person to whom it is directed); *see also Poocha*, 259 F.3d at 1081 (explaining that "[i]t is a

---

[3] As Defendant points out, the Ninth Circuit applies the "fighting words" exception more narrowly "in cases involving words addressed to a police officer." *Poocha*, 259 F.3d at 1081. Here, Plaintiff's statements were directed at his neighbor. Interestingly, that neighbor is a retired police officer, and an argument *could* be made that the rationale for narrowing the fighting words exception in cases involving the police applies to cases, like this one, where an individual communicates disfavor of the police as an institution to a retired police officer. *See Poocha*, 259 F.3d at 1081 (explaining that the fighting words exception "requires a narrower application in cases involving words addressed to a police officer," because (i) "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen" and (ii) the First Amendment provides the most robust protections for criticism of public institutions and official conduct). But this is an undeveloped area of law. For the purposes of this Report and Recommendation, the undersigned assumes, without deciding, that the traditional "fighting words" standard set forth in *Cohen* and *Chaplinsky v. N.H.*, 315 U.S. 568 (1942) applies. *See Cohen*, 403 U.S. at 20 (for statements made to an average citizen, "States are free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called 'fighting words'").

**REPORT AND RECOMMENDATION - 9**

prized American privilege to speak one's mind. . . on all public institutions," even when such criticism involves "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"). Like in *Cohen*, Plaintiff's statements communicated a political message, not a personal attack. While this message was directed towards a more limited audience than in *Cohen* – his neighbor, not an entire courthouse – Plaintiff did not call the Chevalliers names, yell personal insults at them, or suggest that they should physically fight.

The only action Plaintiff took before October 18, 2023[4] that could be characterized as a personal insult was to point his middle finger at Mr. Chevallier once, on October 16, 2023. Like saying "fuck off," this is a relatively common expression of frustration. *See Hackbart v. City of Pittsburgh*, No. 2:07CV157, 2009 WL 10728584, at *4 (W.D. Pa. Mar. 23, 2009) ("the middle finger gesture - like the f-word - has become part of the American vernacular," appearing "on streets and highways, in schools, shopping malls, concert venues, stadiums, courts, execution chambers, in advertisements and on magazine covers, and even on the hallowed floors of legislatures") (citing Ira P. Robbins, Digitus Impudicus: The Middle Finger and the Law, 41 U.C. Davis L. Rev. 1403, 1407-1410 (2008)). Defendant does not argue that Plaintiff's use of this gesture transforms what would otherwise be protected political speech into fighting words.

---

[4] Defendant has presented the Court with evidence that Plaintiff continued to drive by the Chevallier home between November 2023 and October 2024 to insult and harass Mr. Chevallier. As a result of this behavior, Plaintiff was eventually charged with stalking and a state court issued a no contact order. *See* Amended Crim. Compl. (Dkt. 41, pp. 17-21) and D.'s Statement of Facts (Dkt. 40-1). Defendant argues that this evidence shows that Plaintiff acted wrongly towards the Chevalliers. D.'s MSJ at 8 (Dkt. 40-2). This argument misses the mark. The fact that Plaintiff's interactions with Mr. Chevallier escalated *after* Officer Ferrari filed his probable cause affidavit cannot retroactively excuse a prior violation of Plaintiff's constitutional rights. The validity of Officer Ferrari's decision to file charges against Plaintiff must be determined based on the information available to Officer Ferrari at the time he made the charging decision. *See John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008) (the reasonableness of an officer's conduct during an arrest is judged "based upon the information the officer had at the time of making the arrest").

**REPORT AND RECOMMENDATION - 10**

Nor would such an argument be persuasive. Flipping a neighbor off is insulting and rude, but it is not the type of conduct that one would expect to elicit an immediate violent response. *Id.* (displaying one's middle finger to another driver is not fighting words); *see also Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) (a driver who yelled "fuck you" and extended his middle finger at a group of protestors was clearly engaged in protected speech that could not be prosecuted under the fighting words exception).

In short, Plaintiff's behavior is a far cry from the statements that courts have treated as fighting words. *See Gower v. Vercler*, 377 F.3d 661, 670 (7th Cir. 2004) (where a man called his father-in-law a "fat son-of-a-bitch" and a coward and repeatedly said, "fuck you" to his in-laws after brandishing a butcher knife at them the night before, his speech taken together represented fighting words) and *United States v. Stagno*, 839 F. App'x 112, 115-116 (9th Cir. 2020) (unpublished) (a defendant's conduct qualified as "fighting words" where the defendant at a medical facility used racial epithets, "challenged both another patient and the clinic security guard to fights" and gave clinic staff the middle finger).[5] The Court should hold that Plaintiff's statements are protected by the First Amendment.

---

[5] Defendant argues, in passing, that Plaintiff's statements should be treated as fighting words because Plaintiff threatened to shoot Mr. Chevallier. D.'s MSJ at 9-10 (Dkt. 40-2). These threats, however, were not made in connection with Plaintiff's anti-police statements. According to Defendant's probable cause affidavit, Plaintiff threatened Mr. Chevallier after Mr. Chevallier went to Plaintiff's house and attempted to speak with him. At that point, Plaintiff allegedly told Mr. Chevallier that he would shoot him if he did not leave in three seconds. PC Aff. at 1 (Dkt. 41, pp. 3-4). Notably, Defendant did not file any charges against Plaintiff based on this exchange. In any event, six days passed between the threat and Plaintiff's next encounter with Mr. Chevallier. In these circumstances, the relationship between the threats and Plaintiff's subsequent speech are too attenuated to transform Plaintiff's otherwise protected remarks into fighting words.

**REPORT AND RECOMMENDATION - 11**

### B. Qualified Immunity

Officer Ferrari also asserts qualified immunity as a defense to Plaintiff's First Amendment claim. Qualified immunity shields officers from civil liability unless every reasonable officer in the defendant's position would have understood that his behavior violated the right at issue. *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024). While this does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

As the prior discussion illustrates, it is well-settled that criticism of the police is protected speech, no matter how profanely worded the criticism may be. *Cohen*, 403 U.S. at 20; *Poocha*, 259 F.3d at 1082 ("Criticism of the police, profane or otherwise, is not a crime."); *see also Ballentine*, 28 F.4th at 63 (a protestor who chalked anti-police messages, such as "FUCK PIGS!" and "FUCK THE COPS" on the sidewalk was engaged in protected speech). It is also well-settled that using "fuck" to express generalized anger or frustration during a heated exchange is not speech that can be criminalized as "fighting words." *Suiter*, 138 Idaho at 16. Taken together, these cases, and others like them, make it clear that it is unlawful to criminally charge a plaintiff for simply for saying "fuck the police" to a neighbor who is flying a thin blue line flag.[6] In other words, it was clearly unconstitutional for Officer Ferrari to charge Plaintiff with a

---

[6] Any other conclusion would run afoul of bedrock First Amendment principles. *Duran*, 904 F.2d at 1378 ("expression of disapproval toward a police officer" falls "squarely within the protective umbrella of the First Amendment"); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) (demonstrations and protests that "stir[] passions, resentment or anger [are] fully protected by the First Amendment"); *White v. Lee*, 227 F.3d 1214, 1226 (9th Cir. 2000) (criticizing the government is "paradigmatically protected by the First Amendment"); *Poocha*, 259 F.3d at 1081 (explaining that First Amendment protections are at their most robust where individuals speak their minds or engage in debate about public institutions).

**REPORT AND RECOMMENDATION - 12**

criminal offense based on (i) the anti-police content of Plaintiff's statements or (ii) Plaintiff's use of "fuck."

But there is sufficient evidence for a jury to find that this is exactly what happened. According to his probable cause affidavit, Officer Ferrari attempted to cite Plaintiff for disturbing the peace on October 10, 2023, simply because Plaintiff yelled "fuck the police" at his neighbor twice.  To explain this decision, Officer Ferrari noted, among other things, that Plaintiff's "statements alone" and his "foul language" were making the Chevalliers uncomfortable.  To the extent a jury finds that Officer Ferrari charged Plaintiff based on the content of his statements or his "foul language," Officer Ferrari is not entitled to qualified immunity.  *See Ballentine*, 28 F.4th at 59 (explaining that it is clearly established that "an arrest supported by probable cause but made in retaliation for protected speech violates the First Amendment").

### C.  The *Nieves* Requirements

Having determined that a jury could find for Plaintiff on the three traditional elements of a First Amendment retaliation claim, the undersigned must now consider whether Plaintiff has proved the absence of probable cause or presented evidence of differential treatment as required by *Nieves*.  The undersigned will address each issue in turn.

1. Probable Cause

To determine whether an officer had probable cause for an arrest, the court examines "the totality of circumstances known to the arresting officer[]" and asks whether these circumstances would have caused "a prudent person" to conclude "that there was a fair probability" that the suspect was committing or had committed a crime.  *United States v. Price*, 980 F.3d 1211, 1225 (9th Cir. 2020).  "Probable cause is not a high bar."  *District of Columbia v. Wesby*, 583 U.S. 48,

57 (2018) (internal citation omitted). It only requires "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.*

Idaho has adopted a disturbing the peace statute that makes it a crime to "maliciously and willfully disturb[] the peace or quiet of any neighborhood, family or person," by

(i) loud or unusual noise;

(ii) tumultuous or offensive conduct;

(iii) threatening;

(iv) traducing;

(v) quarreling;

(vi) challenging to fight; or

(vii) fighting.

I.C. § 18-6409(1).[7] To comply with the First Amendment, the Idaho Supreme Court has applied narrowing constructions to many of these subsections. Traducing, for example, means "speaking maliciously and falsely to someone face-to-face where the words spoken would constitute 'fighting words.'" *Poe*, 139 Idaho at 895. Similarly, "challenging to fight" means expressly "inviting someone face-to-face to engage immediately in physical combat" or "attempting to incite the addressee to fight by the use of 'fighting words.'" *Id.* at 896.

Here, Defendant argues that he had probable cause to charge Plaintiff with disturbing the peace because Plaintiff's statements constituted "fighting words." Defendant also maintains that Plaintiff engaged in conduct that is prohibited under § 18-6409(1). D.'s MSJ at 8 (Dkt. 40-2).

---

[7] Section 18-6409(1) also criminalizes using "any vulgar, profane or indecent language within the presence or hearing of children, in a loud and boisterous manner." The Idaho Supreme Court, however, has struck this portion of the law down on First Amendment grounds, and it is not relevant here. *State v. Poe*, 139 Idaho 885, 901 (Idaho 2004).

**REPORT AND RECOMMENDATION - 14**

While Defendant never maps these arguments onto specific subsections, as best the undersigned can tell, Defendant believes that Plaintiff disturbed the Chevalliers' peace by (i) loud or unusual noise, (ii) traducing, (iii) quarreling, and, maybe, (iv) challenging to fight.[8]  For the reasons set forth above, Plaintiff's speech did not rise to the level of fighting words.  Defendant, accordingly, lacked probable cause to charge him with disturbing the peace by traducing or challenging to fight.  The undersigned addresses Defendant's two remaining theories below.

     *i. Quarreling*

In *Poe*, the Idaho Supreme Court explained that quarreling is prohibited under § 18-6409 when an individual engages "in an angry dispute in such a manner that the participants' voices maliciously and willfully disturb the peace or quiet of any neighborhood, family or person."  *Poe*, 139 Idaho at 896.  It is not clear to the undersigned whether Defendant is arguing that there was probable cause to charge Plaintiff with this offense.  To the extent he is, this argument raises serious First Amendment questions.  "It has been clearly established since time immemorial that city streets and sidewalks are public fora."  *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996).  Almost three decades ago, the Ninth Circuit held that it was "clear" that

---

[8] Defendant does not argue, nor could he reasonably argue, that the statements that allegedly disturbed the Chevalliers peace (i.e., saying "fuck the police" and flipping Mr. Chevallier off) constituted true threats, which are not protected by the First Amendment and are subject to prosecution under § 18-6409(1).  See *Poe*, 139 Idaho at 895 (explaining that "threatening" as used in § 18-6409(1) only "encompass[es] statements where the speaker intends to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals").  Similarly, Defendant has not identified any non-expressive elements of Plaintiff's conduct, other than the volume of his speech, which could form a basis for charging Plaintiff with disturbing the peace by "tumultuous or offensive conduct."  *Id.* at 895 (explaining that the prohibition against "tumultuous or offensive conduct" is "neutral with respect to the content of any expressive element of such conduct that may exist in a particular circumstance;" it "does not mean speech whose content the hearer finds offensive because such construction would be unconstitutional").

**REPORT AND RECOMMENDATION - 15**

"government may not prohibit angry or inflammatory speech in a public forum unless it is (1) directed to inciting or producing imminent lawless action and (2) likely to incite or produce such action." *Id.* (internal citations omitted).  In other words, it is not permissible (or content-neutral) for states to seek to suppress loud and disruptive disputes while allowing equally loud and disruptive celebrations. *Id.* (angry speech is fully protected by the First Amendment).  How this impacts the *Nieves* analysis is a complicated question, which the undersigned does not recommend the Court address.  Because there was probable cause to believe Plaintiff committed the content-neutral offense of disturbing the peace by "loud or unusual noise," there is no need for the Court to rely on the quarreling subsection.

        *ii. Loud or Unusual Noise*

As set forth above, Idaho law makes it a crime to "maliciously and willfully disturb[] the peace or quiet of any neighborhood, family or person, by loud or unusual noise." I.C. § 18-6409(1).  As used in this statute, "willfully" means a purpose or willingness to commit the act. I.C. § 18-101(1).  "Maliciously" imports a wish to vex, annoy, or injure another person, or an intent to do a wrongful act. I.C. § 18-101(4); *see also Poe*, 139 Idaho at 898.

Here, Plaintiff's statements were clearly purposeful, and there was probable cause to believe they were intended to annoy his neighbors.  The only question is whether they were sufficiently loud to warrant the filing of criminal charges.  The Idaho Supreme Court's *Suiter* decision is instructive in answering this question.

In *Suiter*, the Idaho Supreme Court considered whether a man who became "agitated and critical of the sheriff's office" while talking to a detective in the records division at the courthouse was properly convicted of disturbing the peace after telling that detective to "fuck off." *Suiter*, 138 Idaho at 14-15.  According to the witnesses who overheard the dispute, the

**REPORT AND RECOMMENDATION - 16**

defendant's voice was "'loud,' 'not combative,' 'fairly loud,' 'not real loud,' 'seemed to raise a little bit,' or it 'sounded like he was upset.'" *Id.* at 15.  "[N]o one characterized [defendant] as shouting or screaming." *Id.*  As discussed above, the Supreme Court held that the defendant's use of the words "fuck off" were not fighting words and that the defendant could not be convicted for the content of his speech. *Id.* at 16.  The Court, however, held that there was "sufficient evidence in the record to create a jury question regarding whether [the defendant had] disturbed the peace 'by loud or unusual noise' . . . without regard for the content of his statement." *Id.* at 17.  In other words, the Supreme Court found that there was probable cause to believe that the defendant's voice was loud enough to sustain a conviction under § 18-6409(1).

That holding controls the outcome here.  According to Officer Ferrari's probable cause affidavit, on October 10, 2023, Plaintiff yelled so loudly at the Chevaillers home that Mr. Chevailler could hear him from inside the house and the shouting scared his wife inside the garage.  Under *Suiter*, such yelling can be loud enough to support a conviction for disturbing the peace.

    2.   Differential Treatment

Because Officer Ferrari possessed probable cause to cite Plaintiff for disturbing the peace by loud or unusual noise, Plaintiff's First Amendment claim can only proceed if Plaintiff presents "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech [would not have] been." *Ballentine*, 28 F.4th at 62.  In 2024, the Supreme Court clarified that this standard does not require "specific comparator evidence." *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024).  A plaintiff alleging a retaliatory arrest may satisfy the *Nieves* exception in a variety of ways, including by producing statistical data regarding law enforcement's use of the relevant criminal statute, identifying other

**REPORT AND RECOMMENDATION - 17**

individuals who engaged in similar conduct without being arrested, or presenting testimony or other evidence of a history of non-enforcement. *Id.* (evidence that at an anti-tampering statute had never been used in a particular manner prior to the plaintiff's arrest satisfied *Nieves*) and *Ballentine*, 28 F.4th at 62 (evidence that (i) no one besides the plaintiffs had ever been arrested for chalking on the sidewalk, (ii) other individuals chalking at the courthouse at the same time as the plaintiffs were not arrested; and (iii) officers had permitted plaintiff to chalk on the sidewalk on other occasions constituted sufficient evidence of differential treatment).

Here, Plaintiff has elected not to present *any* evidence in support of his case and has failed to satisfy his burden under *Nieves*. The Court, accordingly, has little choice but to grant summary judgment in favor of Officer Ferrari.

The undersigned is not entirely comfortable with this outcome. As outlined above, Officer Ferrari's affidavit suggests that Plaintiff was not charged based on the volume of his voice, but on the content of what he said. It troubles the undersigned to overlook this evidence.

The Supreme Court, however, has held that "the statements and motivations of the particular arresting officer are irrelevant" to the application of the *Nieves* exception. *Nieves*, 587 U.S. at 407. In her *Nieves* dissent, Justice Sotomayor foreshadowed some of the problems with this standard. As she explained, "direct admissions may often be the best available evidence of unconstitutional motive." *Nieves*, 587 U.S. at 428 (Sotomayor, J., dissenting). Excluding such evidence from consideration can, in some cases, "have the strange effect of requiring courts to blind themselves to smoking-gun evidence while simultaneously insisting upon an inferential sort of proof that, though potentially powerful, can be prohibitively difficult to obtain." *Id.*

Here, for example, Officer Ferrari's own statements would be sufficient for a jury to find that he charged Plaintiff with a crime because Plaintiff said "fuck the police" to a retired police

REPORT AND RECOMMENDATION - 18

officer who disagreed with this sentiment.  Under *Nieves*, however, Plaintiff is not entitled to recourse unless and until he develops evidence that the Nampa police have responded differently to similarly situated individuals who have shouted less charged or less disfavored things at someone's house or person.  The undersigned is sensitive to the burden this imposes on Plaintiff.  The Court, however, is "bound to apply the [*Nieves*] test as articulated by the majority of the Supreme Court." *Thomas v. Cassia County*, No. 4:17-cv-00256-DCN, 491 F. Supp. 3d 805, 814 (D. Idaho September 29, 2020) (acknowledging that an officer had made "cringeworthy" comments regarding the plaintiff, but explaining that these comments were irrelevant under *Nieves*).

While this test has shortcomings, it is worth noting that it does not categorically foreclose claims like the one Plaintiff brings here.  Plaintiff had been afforded an opportunity to request discovery regarding how the Nampa police have enforced the disturbing the peace statute against other individuals.  The undersigned suspects that diligent engagement with this process could have generated sufficient evidence to satisfy *Nieves*.  Plaintiff, however, has elected to stop prosecuting his case.  And, the Court cannot assume that task for him.  *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007) ("A district court lacks the power to act as a party's lawyer, even for pro se litigants.").  The undersigned, accordingly, recommends that the Court grant Officer Ferrari's motion for summary judgment.

## CONCLUSION

This lawsuit raises serious concerns about the constitutionality of the Nampa police department's interactions with Plaintiff.  Based on the information presented in the probable cause affidavit and the corroborating affidavits, a reasonable juror could find that Officer Ferrari charged Plaintiff with disturbing the peace because Plaintiff expressed negative views about the

**REPORT AND RECOMMENDATION - 19**

police to a neighbor – a former police officer – who was flying a thin blue line flag. The undersigned does not endorse this decision. Neither, however, can the undersigned recommend that the claim proceed to trial. Because Plaintiff has not proved the absence of probable cause or presented "objective evidence" of differential treatment, his retaliatory arrest claim must be dismissed.

## RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that:

1. The Court grant Defendant's Moton to Take Judicial Notice (Dkt. 41);

2. The Court grant Defendant's Motion for Summary Judgment (Dkt. 40);

3. The Court dismiss the case with prejudice.

Written objections to this Report and Recommendation must be filed by **August 1, 2025**. *See* District of Idaho Local Civil Rule 72.1(b)(2) (permitting the Court to expand the objection period). Failure to file an objection may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

DATED: July 11, 2025

Raymond E. Patricco
Chief U.S. Magistrate Judge

**REPORT AND RECOMMENDATION - 20**